## SOUTHERN RAILWAY COMPANY *v.* WOFFORD SHOALS LIGHT AND POWER COMPANY.

Where a light and power company applied to a railway company for permission to construct its wires for the transmission of electricity so as to cross the right of way of the railway company, and this application resulted in a written contract between the parties, in which it was provided that no poles should be erected on the right of way of the railway company; but while the negotiations were in progress, and a few days before the signing of the contract, the light and power company caused a pole to be erected on such right of way, and, after the contract was signed, strung wires upon it; and where, upon an application by the light and power company for an injunction against the railway company to prevent its interference with such pole and the wires upon it, the evidence was conflicting as to certain discussions between an officer of the light and power company and a track supervisor of the railway company in regard to what would be a satisfactory location of the pole, but showed, without conflict, that the supervisor had no authority to make any contract on the subject, and that the parties so recognized and proceeded with the negotiations until the written contract was signed, it was error to grant the injunction.

OCTOBER 12, 1910.

Injunction. Before Judge Kimsey. Habersham superior court. June 1, 1910.

The Wofford Shoals Light and Power Company filed an equitable petition, seeking to enjoin the Southern Railway Company from interfering with its line for the transmission of electricity where such line crossed the right of way of the railway. It appeared, on the hearing of the application for injunction, that the only point of controversy between the parties was as to the right of the light and power company to maintain a pole which it had placed on the right of way of the railway company, within about thirty feet of the center thereof, and keep its wires strung upon such pole. A written agreement was made between the light and power company and the railway company, dated June 7, 1909, permitting the former to carry its wires across the track of the latter at Mt. Airy. The contract contained provisions in regard to the height at which such wires should be strung, the use of proper guard-wires, and of substantial poles, so far as they should be near the right of way of the railway company, and other matters. Among its terms was the following: "It being understood that the right of way of the railway company at said point of crossing is 100 feet in width on either side of the center line of said main

track, and that no pole to support said line of transmission wires shall be erected thereon; all being substantially as shown upon the blue-print map hereto annexed and made a part of this agreement." The map attached showed that the wires of the light and power company were to cross the railway company's right of way at a street crossing. It showed no pole located on the right of way. Another blue-print map, attached to a contract made in relation to allowing the wires of the light and power company to cross the right of way of the railway company at Cornelia, a short distance from Mt. Airy, was introduced in evidence, and showed the location of poles on the right of way at that place. The contract for the crossing at Mt. Airy also provided that the light and power company took the license subject to termination, and that it would remove the line of its transmission wires from the right of way of the railway company at any time thereafter upon thirty days notice. It was signed by the railway company through its manager, and by the light and power company through its president. A consent order was taken, continuing the case until the March term, 1910, of court, and in the meantime requiring the plaintiff to construct guard-wires in accordance with the contract, "and unless it can show a subsequent agreement to the said attached agreement, allowing it to place one pole within 100 ft. of the track at Mt. Airy, or if it has not such subsequent agreement, then unless it can obtain one, then the pole at Mt. Airy now situated on deft's. right of way is to be by plaintiff immediately removed after the said term of court, . . and that at said term a final order be taken in this case." The hearing was again continued until April 27, 1910, at chambers. At the hearing the vice-president and general manager of plaintiff (who was the same person who signed the contract as president) testified as follows, in regard to the making of the agreement and the placing of the pole which forms the subject-matter of the controversy: "Deponent, in behalf of and for plaintiff company, before attempting to cross defendant company's tracks at Mt. Airy and Cornelia, Ga., applied to superintendent of defendant railroad company for permission to cross. After said application, stakes were set and passed favorably upon by supervisor Boles, acting for said defendant company. It was something like a month after the said application before the holes for poles were dug at above location, after which they remained

open for more than a week without any notice of dissatisfaction on part of defendant as to said location. Before the poles were raised at these places, deponent went to the residence of said supervisor Boles in Toccoa, Ga., and went over the sketches with said supervisor, and he thoroughly agreed to said locations; after which, our foreman, R. H. Martin, superintendent of construction gang, erected said poles in said holes. Gresham Brothers, hotel men at Mt. Airy, north side of defendant's tracks, were under contract with plaintiffs for lights, and were urging us for the service. Hence I signed this unreasonable contract with said defendant company, not expecting any change or trouble with them. A great outlay of money was necessary to bring and construct our line to these points, and we had no time to parley with these defendants. None of the poles are located on defendant's right of way at Mt. Airy, except one pole on the north side, which is located on defendant's right of way about 30 feet from its tracks. The sketch was made by Mr. Boles some time before the contract, dated the 7th day of June, 1909, was signed, and this hole was dug and pole put in after Mr. Boles made the sketch. The pole had been put in when I received the contract dated 7th day of June, 1909. I signed the contract and kept it in my pocket for a few days, and had the wires strung on these poles after signing the contract. The only difference between the plaintiff and the defendant, as to the erection of the poles, is this particular pole." In July, 1909, the superintendent of the defendant wrote two letters to the president of the plaintiff, in the first of which he said: "You put this crossing up before contract was signed, and not in accordance with contract. I will be glad if you will arrange to fix this crossing in accordance with contract." In the second letter he repeated that the crossing was not put up in accordance with the contract, and asked when this would be done.

Boles, the track supervisor of the defendant, who was referred to in the testimony of the plaintiff's vice-president and general manager, testified that the terms and conditions under which the plaintiff was to construct its wires and poles at Mt. Airy were set forth in the written contract; that he never directly or indirectly agreed with the plaintiff or any of its agents for the wires or poles of the plaintiff to be erected in any other manner or at any other place than as set forth in the agreement; and that the plaintiff had not

strung guard-wires under its transmission wires, as required by the contract. He further testified as follows: "That sometime in the spring of 1909 he was sent to Mt. Airy to prepare a sketch with a view of a contract being entered into between plaintiff and defendant for the construction of plaintiff's work; that in preparing the sketch, or blue-print, Mr. Linler, acting for plaintiff, stated that he wanted to erect the pole in question north of the railroad track, where he did locate the pole, and in preparing the sketch I designated on the blue-print this place for the pole, when I sent in the sketch to the proper department for contracts; that he [I?] did not agree for the pole to be located there; that he [I?] had nothing to do with making any contract with plaintiff for the construction of the work, and did not have any authority to make any contract. When the proper department prepared and sent back the contract with the blue-print annexed thereto, it showed its right of way absolutely clear of poles, and showed each side of the defendant's track 100 ft. distant, and the contract provided that plaintiff should not erect any pole nearer than 100 ft. of defendant's track. . . Sometime after this contract was signed up, I was instructed by the deft. that plaintiff had this pole located on deft's. right of way, within about 30 ft. of center of its track, and to have plaintiff remove it." There was other evidence as to the proper manner of erecting poles and stringing and guarding wires, and as to the necessity for the plaintiff to cross the right of way of the defendant in order to supply customers on the opposite side from that where its plant was located, and as to the manner of the erection of the plaintiff's line.

On the hearing at chambers the presiding judge enjoined the defendant from removing the pole located on its right of way at Mt. Airy, "until the right to keep it at said place shall be finally adjudicated," and added: "The plaintiff is hereby required to comply with the contract in all other respects. The pole having been erected a few days before the contract was entered into, the decision is as above." The defendant excepted.

*Robert McMillan* and *A. G. & Julian McCurry,* for plaintiff in error. *John L. Perkins* and *Frank A. Hooper,* contra.

LUMPKIN, J. (After stating the foregoing facts.) According to the uncontradicted evidence, the plaintiff and defendant were engaged in a negotiation for the purpose of entering into a written

contract in regard to permitting the plaintiff to construct its wires across the right of way of the defendant. While this negotiation was in progress, and before the written contract had been signed, the plaintiff erected the pole which is the subject-matter of the controversy. The vice-president and general manager of the plaintiff (who was also the person who signed the contract as president) sought to justify this action by saying that he had consulted with the track supervisor of the defendant, and the latter agreed to the location of the pole. But it is evident from his own testimony that he did not consider the track supervisor as an officer having authority to make a contract for the company, and that this approval of the supervisor was merely tentative. The supervisor denied making any agreement, and testified without conflict that he had no authority to make any such contract. When the written contract was returned for signature by the plaintiff's officer, the pole had been erected, but the wires had not been strung upon it. It is evident that the plaintiff's officer understood that the company declined to agree for him to have a pole upon its right of way. He testified that customers were urging him for the electrical service, and "hence I signed this unreasonable contract with said defendant company, not expecting any change or trouble with them. A great outlay of money was necessary to bring and construct our lines to these points, and we had no time to parley with these defendants. . . I signed the contract and kept it in my pocket for a few days, and had the wires strung on these poles after signing the contract."

This was not a condemnation proceeding under the State's right of eminent domain, but the pole must have been erected by the plaintiff upon the defendant's right of way either by virtue of the agreement with the defendant or without regard to the agreement. If the erection of the pole and the stringing of the wires upon it are sought to be justified by the agreement, it was done in palpable violation of the terms of the contract, which declared that no poles should be erected upon the defendant's right of way. If such action was not taken by agreement with the defendant, it was a trespass and without any justification in law. It can not be successfully contended that the plaintiff had any legal right to invade the right of way of the defendant and plant its pole thereon without the consent of the defendant, or to keep it there after

being wrongfully so placed, over the objection of the defendant. In either event, therefore, the plaintiff had no right to maintain its pole upon the defendant's right of way and to string wires upon it.

The consent order which was taken, continuing the case, contains an indication that the plaintiff recognized the necessity for obtaining a further agreement from the defendant in order to maintain its pole upon the right of way of the latter. This is not a case where two parties are in controversy as to the ownership of land, and where one erects improvements or structures upon it under his claim of ownership or right.

From what has been said it follows that the court erred in granting the injunction on the ground that the pole had been erected a few days before the contract was signed. Nor was the error cured by adding to the order the mandatory provision, of at least doubtful propriety, as a part of a ruling on an application for an interlocutory injunction, that the plaintiff was required to comply with the contract in all other respects.

*Judgment reversed. All the Justices concur.*